UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION


JACK MOORMAN AND CAROL MOORMAN                          PLAINTIFF


VS.                                    CIVIL ACTION NO. 4:04CV206LN


TOWER MANAGEMENT COMPANY, ET AL.                        DEFENDANTS


MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendants[1]
Trust for summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure.  Plaintiffs Jack Moorman and Carol
Moorman have responded in opposition to the motion and the court,
having considered the memoranda of authorities, together with
attachments, submitted by the parties, concludes that the motion
should be denied.

Plaintiffs Jack Moorman and his wife, Carol Moorman, filed
this suit to recover damages for injuries sustained when Mr.
Moorman fell after tripping on a piece of broken concrete on the
mobile home lot which the Moormans leased from defendants.[2]  The

_____

[1]     Defendants are Tower Management Company; William G.
Steele, Jr.; Boggs Steele Investments, LLC; Tower Communications,
LLC; The Steele Family Trust; William G. Steele, Jr. and Barbara
T. Steele, Co-Trustees of the Steele Family Trust; the Logan A.
Boggs 1998 Family Trust; Logan A. Boggs, Jr., Trustee of the Logan
A. Boggs 1998 Family Trust and the Mary Jane Kurlander

[2]     It is undisputed that at various times during the
Moormans' tenancy at Hill Country Estates, the property was owned
by one or more of the named defendants and that at the time the
Moormans leased the lot in question and at the time of Mr.

Moormans, asserting claims based on theories of negligence and breach of an implied warranty of habitability, allege that defendants breached their duty to provide plaintiffs with a reasonably safe premises and are liable for the damages caused by this breach.

Defendants have moved for summary judgment, contending that plaintiffs cannot prevail on their claims because as a matter of law, defendants had no duty with respect to the repair and maintenance of the subject mobile home lot.  The question thus presented by defendants' motion is this:  Did defendants have a duty to repair or remove the broken concrete?  Defendants argue they did not, and that under the law and the clear terms of the plaintiffs' lease agreement, plaintiffs were responsible for all repairs on the premises.  Plaintiffs, on the other hand, take the position that defendants' lease of the premises to plaintiffs carried with it an implied warranty of habitability, which defendants breached by failing to provide the premises to plaintiffs in a reasonably safe condition at the inception of the lease and failing thereafter to correct a known hazardous condition.

-------------------

Moorman's fall, respectively, the property was managed by Tower Management Company and Tower Communities, LLC.  Although the Tower defendants did not own the property, they did act as agents for the owners in managing the property.

The following facts appear undisputed, at least for purposes of the present motion:  The Moormans leased Lot 137 in the Hill Country Estates mobile home park from the Johnson Family Trust on February 20, 2002.  At the time of that initial lease, the concrete sidewalk in front of plaintiffs' trailer was "busted up." Plaintiffs were aware of this condition, and indeed, were told by a representative of the then-owner that the sidewalk would be repaired.

In March 2002, shortly after plaintiffs moved onto the property, the mobile home park was purchased by defendants. According to plaintiffs, Mr. Moorman discussed the condition of the sidewalk with a representative of defendants sometime during March or April, and was told that it would be repaired.  On June 2, 2003, defendants had plaintiffs sign a new lease agreement "for the rental and occupancy of a site" in the mobile home park.  This lease recited as follows:

> It is . . . agreed that the LESSOR shall not be called upon to make any improvements or repairs whatsoever upon the said premises or any part thereof, but LESSEE agrees to keep the same in good order and condition at LESSEE'S own expense.[3]

---

[3]     In their depositions, the Moormans agreed that they signed a new lease agreement with defendants, and admitted their signatures appeared on a June 2, 2002 lease agreement offered as evidence by defendants, but neither was able to recall having read the agreement.  Notwithstanding that they may have failed to read the agreement, however, plaintiffs are bound by its terms.  See Ross v. Citifinancial, Inc., 344 F.3d 458, 464-66 (5th Cir. 2003) (holding that under Mississippi law, signatories to a contract are under an obligation to read the contract before signing it and

3

Plaintiffs also signed a separate document acknowledging receipt of a copy of the Park Policies.  Among other things, the Park Policies provided that plaintiffs would

> maintain their home and yard in a clean, neat, safe, and orderly condition including, but not limited to, properly caring for shrubbery, lawns, replacing or repairing damaged awnings, porches, steps, walkways, foundation coverings or bent awning supports.

Plaintiffs allege that despite the promise by defendants' representative that the sidewalk would be repaired, it was not, and thus, plaintiffs were forced to step over or walk around the chunks of broken concrete to get from their car to the door of the mobile home.  Then, on April 10, 2003, as Mr. Moorman was attempting to step over the broken concrete to get to the mobile home, his toe caught on the concrete, causing him to fall, as a result of which he suffered severe, permanent and debilitating injuries.

Plaintiffs originally claimed, or so it seemed, that defendants were liable for their alleged negligence in failing to maintain the subject mobile home lot in a reasonably safe condition during the term of the lease.  From a review of plaintiffs' response to defendants' summary judgment motion, it now appears their claim is grounded not so much on a continuing duty during the term of the lease to correct alleged hazardous

thus, "are bound as a matter of law by the knowledge of the contents of a contract in which they entered notwithstanding whether they actually read the policy") (citations omitted).

conditions on the property, but rather on the alleged breach of an implied warranty of habitability, which plaintiffs submit obligated defendants to provide them with a reasonably safe premises *at the inception of their leasehold,* i.e., when defendants took over ownership and management of the property in March 2002.

Prior to <u>O'Cain v. Harvey Freeman and Sons</u>, 603 So. 2d 824 (Miss. 1991), the Mississippi Supreme Court "unquestioningly applied *caveat emptor* to landlord-tenant relationships," although in implicit recognition of the harshness of the doctrine, the court had created exceptions to the doctrine.  <u>Id</u>. at 832.  There were exceptions for a landlord's failure to disclose known latent defects; for defects in parts of the premises subject to common use; for repairs undertaken by the landlord but negligently performed; and for a landlord's express covenant to repair.  <u>Id</u>. n.2 (citations omitted).  In <u>O'Cain</u>, however, based on the concurrence authored by Justice Sullivan and joined by a majority of the justices, the court abandoned *caveat emptor* and adopted an implied warranty of habitability for "residential leases." Justice Sullivan's concurrence advocated abandoning the common law rule of *caveat emptor* as applied to residential lease agreements, and applying, instead, a general implied warranty of habitability. He declared:

> I can no longer endorse the application of *caveat emptor*
> to residential lease agreements.  With regard to such
> leases, we should dispose of the outmoded, problematic
> and unduly burdensome doctrine of *caveat emptor* which
> treats a lease agreement as a conveyance of land.  The
> better view is to recognize that landlords are not
> selling an interest in land, residential tenants do not
> intend to purchase an interest in land, residential
> leases are contracts, and landlords have more incentive
> and opportunity than tenants to inspect and maintain the
> condition of the premises.

Id. (citations omitted).

Justice Sullivan opined that this approach was in line with
the then-recent legislative enactment of the Residential Landlord
and Tenant Act, Miss. Code Ann. § 89-8-1 et. seq., which requires
landlords to comply with requirements of "applicable building
codes materially affecting health and safety" and to "[m]aintain
the dwelling unit, its plumbing, heating and/or cooling system in
substantially the same condition as at the inception of the
lease."  Id.  However, he did not view the RLTA as sufficient,
because building and housing codes which affect health and safety
are often governed locally and therefore do not establish a broad,
generally applicable standard.  Accordingly, he wrote:

> I advocate that the bare minimum standard for an implied
> warranty of habitability should require a landlord to
> provide reasonably safe premises at the inception of the
> lease, and to exercise reasonable care to repair
> dangerous defective conditions upon notice of their
> existence by the tenant, unless expressly waived by the
> tenant.

Id. at 833.  See also Joiner v. Haley, 777 So. 2d 50, 51-52 (Miss.
Ct. App. 2000)(implied warranty of habitability towards landlords

6

adopted through Justice Sullivan's concurrence in <u>O'Cain</u>); <u>Sweatt</u> <u>v. Murphy</u>, 733 So. 2d 207, 210 Miss. 1999)(confirming court's adoption of implied warranty of habitability for residential leases).  It is now well recognized in this state that a landlord's breach of the implied warranty of habitability entitles the tenant to pursue both contract and tort remedies.  See <u>O'Cain</u>, 603 So. 2d at 833 ("There is no reason why a landlord should not . . . be subject to tort liability when he has failed to use reasonable care to provide safe premises and this failure has caused the tenant personal injuries.").

Defendants argue that while Mississippi law recognizes an implied warranty of habitability with regard to residential leases, i.e., leases for dwelling units, this implied warranty does not extend to the lease of a mobile home lot because a mobile home lot is a parcel of land, not a residence or a dwelling unit. They further argue that even if such a warranty did apply to mobile home lots, it would not apply here because plaintiffs waived any such warranty in their lease agreement.

The first issue presented, then, is whether Mississippi's warranty of habitability applies to the lease of a mobile home lot.  Defendants submit that Justice Sullivan's reasoning in <u>O'Cain</u>, including his reference to the Residential Landlord and Tenant Act, reflects the court's intent that the implied warranty of habitability be limited to "residential lease agreements," that

7

is, those which provide for the lease of a "dwelling unit."
Plaintiffs, on the other hand, submit that they did not merely
lease a piece of land, but rather an improved lot intended for use
solely for their residence, and that the same considerations which
led the court to adopt the warranty of habitability for actual
dwelling structures apply equally here.

As this is an issue of first impression for Mississippi, this
court must resort to an Erie-guess as to how the Mississippi
courts would rule on the issue.  Having done so, the court
concludes that the Mississippi Supreme Court would apply the
implied warranty of habitability to mobile home lots.

The few courts that have considered the issue have found this
implied warranty applicable to mobile home lots.  This court has
found no case holding otherwise.  Notable among the cases
extending the warranty in this manner is Staley v. Bouril, 553 Pa.
112, 718 A.2d 283, 285 (1998), one of the first cases to consider
the issue.  The court's reasoning for extending the warranty is
sound.  In deciding whether the implied warranty of habitability
applied to the lease of improved lots in a mobile home park, the
court in Staley recalled the reason it had abandoned the doctrine
of *caveat emptor* and adopted the implied warranty of habitability
in residential leases in the first place, i.e., "'in order to keep
step with the realities of modern day leasing.'"  Id. at 115-16,

8

718 A.2d at 284 (quoting <u>Pugh v. Holmes</u>, 486 Pa. 272, 405 A.2d 897

(1979)).  The court wrote,

> <u>Pugh</u>'s primary rationale for adopting the implied
> warranty of habitability is that, "the modern tenant is
> not interested in land, but rather bargains for a
> dwelling house suitable for habitation."  <u>Id.</u> at 282,
> 405 A.2d at 902.  <u>Pugh</u> recognizes that, unlike tenants
> in feudal society to whom "any shelters or structures
> existing on the land were 'incidental' concerns, . . .
> the modern apartment dweller is a consumer of housing
> services."  <u>Id.</u> at 280-82, 405 A.2d at 901-02 (citation
> omitted).  Thus, "[t]he contemporary leasing of
> residences envisions one person (landlord) exchanging
> for periodic payments (rent) a bundle of goods and
> services, rights and obligations."  <u>Id.</u> at 282, 405 A.2d
> at 902 (citation omitted).  Such goods and services
> include "not merely walls and ceilings, but also
> adequate heat, light and ventilation, serviceable
> plumbing facilities, secure windows and doors, proper
> sanitation, and proper maintenance."  <u>Id.</u> (citation
> omitted).

<u>Id.</u> at 116, 718 A.2d at 284.[4]  The <u>Staley</u> court recognized that

"in leasing improved lots in a mobile home park," tenants "bargain

for a similar bundle of goods and services," including, for

example, "potable water, adequate septic service, and proper

electrical connections," all of which are "essential components of

a habitable residence."  <u>Id.</u>, 718 A.2d at 284-85.  The court also

recognized that "landlords of mobile home parks, like other

landlords, generally have far greater bargaining power than their

tenants."  <u>Id.</u>, 718 A.2d at 285.  On the other hand, the court

---

[4]     The court notes that the <u>Pugh</u> court was among the
"progressive" courts to which Justice Sullivan alluded in <u>O'Cain</u>
as having abandoned *caveat emptor* in favor of the implied warranty
of habitability for residential leases.

acknowledged that unlike the typical residential lease, "which is intended primarily to convey an interest in a residence, and not the land that underlies it," the lease of a mobile home lot "is intended primarily to convey an interest in a plot of land, albeit with some improvements, and has nothing to do with the dwelling structure that sits on top of it." Id. at 116-17, 718 A.2d at 285. The court thus concluded that the lessee of a mobile home lot does not receive the same implied warranty of habitability that is present in the typical residential lease, but it does give rise to "a limited implied warranty of habitability, the scope of which depends on the particular circumstances of the case." Id., 718 A.2d at 285. The court stated that in applying the limited warranty of habitability,

> a breach of the warranty occurs where there is a defect "of a nature and kind which will prevent the use of the [lot] for its intended purpose to provide premises fit for habitation. . . ." [Pugh, 486 Pa.] at 289, 405 A.2d at 905. "Materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis," and depends on such factors as "the existence of [regulatory] violations and the nature, seriousness and duration of the defect." Id. at 289, 405 A.2d at 905-06 (citation omitted).

Id., 718 A.2d at 285.

Other courts have found the implied warranty of habitability to apply mobile home lots on similar reasoning. See Renken v. Ludwig, No. 19615-1-III, 110 Wash. App. 1037, 2002 WL 244974, at *4-5 (Wash. Ct. App. Feb. 21, 2002) (finding that implied warranty of habitability applied to mobile home lot where lot was leased

"for the sole purpose of placing a manufactured home on it," and stating, "Leased home sites must be suitable for the purpose for which they are rented.  No less than other tenants, mobile home park dwellers contract for a bundle of rights and services comprising a habitable space."); see also King v. Brace, 150 Vt. 222, 552 A.2d 398 (1988) (where state law recognized implied warranty in the rental of any residential dwelling obligating landlord to deliver and maintain premises that are safe, clean and fit for human habitation, court found breach of implied warranty of habitability where sewerage and water defects rendered mobile home lot unfit for residential purposes).  Moreover, a number of state legislatures have also adopted habitability standards for mobile home parks.  See, e.g., Sterling v. Stevens, 2003 WL 22232008, *2 (Ohio Ct. App. 2003) (observing that Ohio mobile home park operators have same statutory duty as residential landlords, namely, to "[m]ake all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition") (citing R.C. 3733.10(A)(2); R.C. 5321.04(A)(2)); Marple v. Papermill Park Corp., 1993 WL 945946, *4 (Va. Cir. Ct. 1993) (observing that Virginia's Mobile Home Lot Rental Act provides that various sections of the Virginia Landlord Tenant Act, including those which obligate the landlord to make repairs necessary to put and keep the premises in a fit and habitable condition and grant a right of action for damages for a person

11

adversely affect by a landlord's breach of duty, apply "to the
rental and occupancy of mobile home lot") (citing Va. Code
55-248.13, 55-248-40, 55-248.48); <u>Clarkson Mobile Home Park, Inc.
v. Ecklund</u>, 141 Misc. 2d 83, 532 N.Y.S.2d 615 (N.Y. Co. Ct. 1987)
(observing that warranty of habitability originally recognized as
applying to residential leases had been codified by legislature
and co-extensive warranty of habitability extended to mobile home
parks) (citing McKinney's Real Property Law § 233(e)).

This court is of the opinion that the Mississippi Supreme
Court would find the reasoning of <u>Staley</u> and <u>Renken</u> persuasive and
hold that those who rent mobile home lots for the purposes of
residing thereon have the same general expectation with respect to
the habitability of their lot as one who rents a dwelling, and
that the lessor of such a lot is required to provide "a reasonably
safe premises at the inception of the lease, and to exercise
reasonable care to repair dangerous defective conditions upon
notice of their existence by the tenant, unless expressly waived
by the tenant."  <u>O'Cain</u>, 603 So. 2d at 833.

Seizing on the "unless expressly waived" language of <u>O'Cain</u>,
defendants argue that even if the law would recognize an implied
warranty of habitability as applicable to mobile home lots, such a
warranty is obviously subject to waiver.  According to defendants,
Justice Sullivan's concurring opinion in <u>O'Cain</u> and the provisions
of the Residential Landlord Tenant Act stand for the proposition

12

that the duties of the landlord can be assumed by the tenant and thus waived; and they submit that this is precisely what occurred here.  That is, defendants contend that plaintiffs' lease agreement clearly shifts the responsibility for the maintenance and repair of the subject lot to the plaintiffs; that plaintiffs, with full knowledge of the condition of the premises, freely and voluntarily entered into the lease agreement and agreed to abide by the park policies; and plaintiffs thereby relieved defendants of any duty with respect to the condition of the premises.

In response to defendants' argument on this point, plaintiffs insist that Justice Sullivan's statement regarding waiver obviously contemplated the possibility of waiver only with respect to a landlord's duty to maintain the premises *during* the term of the lease, but not with respect to the landlord's duty to provide a habitable premises *at the inception of the lease.*  Plaintiffs argue that the latter is not subject to waiver, reasoning that the warranty would cease to exist altogether if landlords, who typically are in the better bargaining position, could relieve themselves of any duty to provide a habitable premises at the start of a leasehold simply by the expedient of a contractual provision shifting the burden to the tenant.  While plaintiffs insist this cannot be the law, it seems to the court that it is. However, that does not mean that the lessee is entirely vulnerable in this regard.

13

Again, Justice Sullivan stated:

> [T]he bare minimum standard for an implied warranty of
> habitability should require a landlord to provide
> reasonably safe premises at the inception of the lease,
> and to exercise reasonable care to repair dangerous
> defective conditions upon notice of their existence by
> the tenant, unless expressly waived by the tenant.

Id. at 833.  Read alone, this passage is arguably ambiguous as to

what can be waived.  However, one of the cases cited by Justice

Sullivan in support of this statement is particularly informative.

Mansur v. Eubanks, 401 So. 2d 1328, 1329-30 (Fla. 1981), included

similar waiver language, stating:

> [T]he owner of a residential dwelling unit, who leases
> it to a tenant for residential purposes, has a duty to
> reasonably inspect the premises before allowing the
> tenant to take possession, and *to make the repairs
> necessary to transfer a reasonably safe dwelling unit to
> the tenant unless defects are waived by the tenant* . . .
> After the tenant takes possession, the landlord has a
> continuing duty to exercise reasonable care to repair
> dangerous defective conditions upon notice of their
> existence by the tenant, unless waived by the tenant.

It seems reasonably clear, therefore, that Justice Sullivan

contemplated that a lessee could waive the lessor's "duty to make

repairs necessary to transfer a reasonably safe dwelling unit to

the tenant" at the inception of the lease.  It does not follow

from this that defendants are entitled to summary judgment.  The

fact that the warranty of habitability is subject to waiver does

not mean that there was a waiver here.  In the court's opinion, a

question of fact does exist as to whether such a waiver occurred.

14

The standards and rules regarding proof of waiver assist the lessee.  Waiver is the voluntary relinquishment of a known right.  <u>Wilson v. General Motors Acceptance Corp.</u>, 833 So. 2d 56, xx (Miss. 2004) ("Waiver is defined as 'an intentional relinquishment or abandonment of a known right or privilege.'") (quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1938)).  Moreover, the fact of waiver typically must be proved by clear and convincing evidence.  <u>See</u> <u>Swift v. Aberdeen Lumber Co.</u>, 172 Miss. 697, 159 So. 301, 305 (Miss. 1935).  Furthermore, the Residential Landlord Tenant Act, which informed Justice Sullivan's concurrence in <u>O'Cain</u>, provides that "a landlord and tenant may agree in writing that the tenant perform some or all of the landlord's duties under this section, *but only if the transaction is entered into in good faith*."  Miss. Code Ann. § 89-8-23 (emphasis added).

Here, Mr. Moorman claims that a representative of defendants promised him that defendants would repair the broken sidewalk; he presumably believed this would be done, notwithstanding provisions in the lease agreement that would otherwise have obligated him to repair and maintain the premises.  Assuming for present purposes that repair of the sidewalk would have been necessary to render the premises habitable,[5] then if the jury were to accept Mr.

---

[5]    Another issue which will remain for jury resolution is whether the "busted up" sidewalk constituted to a violation of the warranty of habitability.  The parties have presented no argument

Moorman's testimony, they would surely be justified in concluding that plaintiffs did not knowingly and voluntarily waive their right to have defendants repair the sidewalk, and would similarly be warranted in concluding that the transaction was not in good faith.

For the foregoing reasons, the court cannot conclude that summary judgment is appropriate.  It is therefore ordered that defendants' motion for summary judgment is denied.

SO ORDERED this 6th day of September, 2006.


                                    /s/ Tom S. Lee
                                    UNITED STATES DISTRICT JUDGE



_____

on this issue and little evidence, in fact, as to the exact condition of the sidewalk or the danger posed thereby.  The court can envision a scenario in which the location and condition of a sidewalk was unreasonably dangerous so as to affect the habitability of the lot, and which could support a finding that the implied warranty of habitability has been breached.  This, then, would be a legitimate issue for a jury.  Cf. Krugh v. Laurich, 1991 WL 575857, *3 (Pa. Com. Pl.), 17 Pa. D. & C. 4th 666, 671 (Pa. Com. Pl. 1991)("By way of example, allegations of an unstable rear wood deck, sidewalk subsidence, dangerously weak garage walls, use of untreated lumber in below grade construction, and defective window/door caulking could, if proven at trial to be of a sufficiently serious magnitude, be found to violate the warranty of habitability."); Joiner v. Haley, 777 So. 2d 50, 52 (Miss. Ct. App. 2000) (question "whether the existence of a second-floor door opening into thin air over a ground-level concrete patio was an unreasonably dangerous condition affecting the habitability of the premises" was legitimate jury question).